

399-09/PJG/BGC
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
GALA INVESTMENTS INC.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax



**'09 CIV 7095**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

GALA INVESTMENTS INC.,

                          Plaintiff,

    - against -

KINGFISH SERVICES LIMITED,

                          Defendant.

-----------------------------------------------------------------x

09 Civ_____ (   )

**VERIFIED COMPLAINT**

       Plaintiff, GALA INVESTMENTS INC. (hereinafter "Gala" or "Plaintiff"), by its

attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant

KINGFISH SERVICES LIMITED (hereinafter "Kingfish" or "Defendant"), alleges as follows:

       1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331 in that the action arises under the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards codified at 9 U.S.C. §201 *et seq.* and/or the Federal

Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times material hereto, Plaintiff Gala was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 80 Broad Street, Monrovia, Liberia.

3.    At all times material hereto, Defendant Kingfish was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an office and place of business at 24c Old Burlington Street, London, England, W1S3AU.

4.    On or about November 25, 2008, Plaintiff Gala, as owner, and Defendant Kingfish, as charterer, entered into a maritime contract of charter party on a SHELLTIME 4 form of time charter for the use and operation of the vessel the M/T MAISTROS. A copy of the charter party (hereinafter "the Charter Party") is annexed hereto as Exhibit A.

5.    Pursuant to the terms of the Charter Party, the vessel was to be let to Kingfish for a period of 24 months "firm, always +/- 30 days in Charterer's Option on the final period", at a daily hire rate of $26,000 per day, "...payable 30 days in advance per calendar month".

6.    The vessel was duly delivered to Kingfish and performance under the charter commenced in May, 2009.

7.    The Defendant Kingfish has repudiated the Charter Party by confirming that it will not continue to perform the contract, but will instead re-deliver the vessel prematurely on completion of discharge at Houizhou China on or about August 11/12, 2009.   A copy of the email to the vessel's manager confirming Kingfish's repudiation is attached hereto as Exhibit B.

8.    Under the Charter Party, performance was to have continued through April 28, 2011.

9.    By virtue of the breach as aforesaid, the balance of hire due and outstanding up to the estimated completion of discharge at Houizhou (i.e. the intended premature redelivery date) is $728,676.50. (*See*, Ex C, copy of the Statement of Account dated August 11, 2009.

10.    Plaintiff Gala has fulfilled all obligations required under the Charter Party.

11.    The charter party provides for the application of English Law and all disputes arising out of the contract shall be referred to arbitration in London.

12.    Plaintiff has commenced arbitration proceedings against the Defendant.

13.    This action is brought to obtain jurisdiction over the Defendant, security in favor of Plaintiff Gala in respect to its claim against the Defendant and in aid of arbitration proceedings and to compel the Defendant's appearance in the arbitration.

14.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs, including attorneys' fees, arbitrators' fees, disbursements and interest, are recoverable as part of Plaintiff's claim.

15.    This action is further brought to obtain security for the additional sums which are recoverable including Plaintiff's anticipated attorneys' and arbitrators' fees and costs in the London arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

16.    Plaintiff estimates, as nearly as can be computed, that the legal expenses and costs of prosecuting the claim in London arbitration will be **$182,169.13**, and interest on its damages are estimated to be **$109,301.47** (calculated at the rate of 5% for a period of three years, the estimated time for completion of the proceedings in London).

## Request for Rule B Relief

17. Upon information and belief, and after investigation, the Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed and believes, based upon the pattern of prior payments, all of which were made in dollars and which were routed through New York banks, that the Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of the Defendant (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name or for its benefit, at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

18. The total amount to be attached pursuant to the calculations set forth above is **$1,020,147.10**.

WHEREFORE, Plaintiff Gala prays:

a. That process in due form of law according to the practice of this Court may issue against the Defendant citing it to appear and answer the foregoing or be subject to a default;

b. That if the Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of the Defendant up to and including **$1,020,147.10** be restrained and attached, including, but not

limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of the Defendant (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received or transferred for its benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein, and those assets be held for satisfaction and execution of any eventual award that may be entered in favor of Plaintiff and/or utilized in satisfaction of execution of any judgment that may be entered herein either in recognition of any such award or by way of default;

c.   That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to an order compelling Defendant to arbitrate and/or the recognition and enforcement of any award or judgment entered against the Defendant; and

d.   That this Court retain jurisdiction over the matter for any subsequent enforcement action as may be necessary; and

c.    For such other, further and different relief, as the Court may deem just and proper

in the premises.

Dated: New York, New York
       August 11, 2009

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
GALA INVESTMENTS INC.

By: _____

   Peter J. Gutowski
   80 Pine Street
   New York, NY 10005
   (212) 425-1900

6

## ATTORNEY VERIFICATION

State of New York      )
                       ) ss.:
County of New York  )

Peter J. Gutowski, being duly sworn, deposes and says as follows:

1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Peter J. Gutowski

Sworn to before me this
11th day of August, 2009

_____
Notary Public

CLARE HENRY
Notary Public, State of New York
No. 01HE4831498
Qualified in Kings County
Certificate in New York County
Commission Expires October 31, 2009

Ex. A

Code word for this Charter Party
"SHELLTIME 4"

*Time Charter Party*

Issued December 1984

LONDON - November 25th, 2008

IT IS THIS DAY AGREED between    GALA INVESTMENTS INC.    1

of MONROVIA - LIBERIA    ( hereinafter referred to as "Owners" ), being owners of the    2

good    Liberian    vessels called    mt "MAESTRO"    3

(hereinafter referred to as "the vessel") described as per Clause 7 hereof and    Kingfish Services Limited

of    (hereinafter referred to as "Charterers"):    4

**Description and Condition of Vessel**

1.    At the date of delivery of the vessel under this charter    5
   (a)    she shall be classed: ABS    6
   (b)    she shall be in every way fit to carry crude petroleum and/or its products;    7,8
   (c)    she shall be tight, staunch, strong, in good order and condition, and in every way fit for the    9
service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator    10
and radar) in a good and efficient state;    11
   (d)    her tanks, valves and pipelines shall be oil-tight;    12
   (e)    she shall be in every way fitted for burning    13

at sea - fueloil with a maximum viscosity of Owners to Advise   Centistokes at 50    14
degrees Centigrade/any
commercial grade of fuel oil Owners to Advise for main propulsion, marine diesel oil/ACGEO    15
for auxiliaries    16
in port - marine diesel oil/ACGEO for auxiliaries;    17

   (f)    she shall comply with the regulations in force so as to enable her to pass through the Suez and    18
Panama Canals by day and night without delay;    19
   (g)    she shall have on board all certificates, documents and equipment required from time to time by    20
any applicable law to enable her to perform the charter service without delay;    21
   (h)    she shall comply with the description in Form B appended hereto, provided however that if there is    22
any conflict between the provisions of Form B   vessels provisional Q88/description and any other provision,    23
including this Clause 1, of this charter
such other provision shall govern.    24

**Shipboard Personnel and their Duties**

2.    (a)    At the date of delivery of the vessel and throughout period under this charter    25
   (i)    she shall have a full and efficient complement of master, officers and crew for a vessel of her    26
tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be    27
trained to operate the vessel and her equipment competently and safely;    28
   (ii)    all shipboard personnel shall hold valid certificates of competence in accordance with the    29
requirements of the law of the flag state;    30
   (iii)    all shipboard personnel shall be trained in accordance with the relevant provisions of the    31
International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978-1995;    32
   (iv)    there shall be on board sufficient personnel with a good working knowledge of the English    33
language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and    34
to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be    35
carried out quickly and efficiently,    36
   (b)    Owners guarantee that throughout the charter service the master shall with the vessel's officers    37
and crew, unless otherwise ordered by Charterers,    38
   (i)    prosecute all voyages with the utmost despatch    39
   (ii)    render all customary assistance and    40
   (iii)    load and discharge cargo as rapidly as possible when required by Charterers or their agents    41
to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the    42
case may be) and in each case in accordance with any applicable laws of the flag state.    43

**Duty to Maintain**

3.    (i)    Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any    44
event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the    45
conditions stipulated in Clauses 1 and 2(a), exercise due diligence so as to maintain or restore the vessel.    46
   (ii)    If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the    47
requirements of Clauses 1,2 (a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers  for    48
such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services    49
under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so    50
lost. After presentation to owners of duly documented claim and owners agreement    51
   Any reduction of hire under this sub Clause (ii) shall be without prejudice to any other remedy    52
available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded  from    53
any calculation under Clause 24.    54
   (iii)    If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in    55

writing; and if, after the expiry of 30 [] 30 days following the receipt by Owners of such notice Owners have    56
failed to demonstrate to Charterer's reasonable satisfaction the exercise of due diligence as required in Clause 3(I),    57
the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they    58
are exercising such due diligence.    59
          Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the    60
option to terminate this charter by giving notice in writing with effect from the date on which such notice of    61
termination is received by Owners or from any later date stated in such notice. This sub-Clause (III) is without    62
prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without    63
limitation Charterers rights under Clause 71 hereof).    64
          Owner have the right to substitute the vessel with one that is of a similar age, approved status (to    
the best of owners knowledge), capacity and deadweight upon giving reasonable notice to charterers and placing    
the substitute vessel charterers disposal in no worse geographical position or timing.    

Period Trading    4.    Owners agree to let and Charterers agree to hire the vessel for a period of    24 months firm , always +/-30    65
Limits              days in Charterers's Option on the fixed period    

commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise    66
(subject always to Clause 28) including in particular Vessel to carry clean petroleum products, DPP, Crude Oil, in    67
accordance with vessel's Coating Resistency List and vessel's description/specification. All cargoes to be allowed by    
vessel's Class and regulations of vessel's flag state. Following cargoes are specifically excluded: lubes, solvents,    
chemicals, pyros, caringheads, vegoils, coloured cargoes, nafta and into classified cargoes.  Last two (2) cargoes on    
redelivery to be unclean, unloaded and unladker than 2.5 NPA.  Last 2 cargoes on redelivery to be clean, unloaded,    
unladker than 2.5 NPA    

in any part of the world, as Charterers shall direct, subject to the limits of the current British Institute Warranties and    68
any subsequent amendments thereof.  Notwithstanding the foregoing, but subject to Clause 28, Charterers  may    69
order the vessel to the bound waters or to any part of the world outside such limits provided that Owners consent    70
thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance  premium    71
required by the vessel's underwriters as a consequence of such order.  Worldwide, AWIWI , between safe ports and    72
always afloat, always excluding    

Chinese River Ports, Eritrea, Somalia, Djibouti, Inner Berths in Nigeria, Albania, Cuba, Israel, North Korea,  Iraq,    
Orinoco River, Maracaibo, Haiti, Cairipito, HX, if Sea excl Sea of Azov, If St. Lawrence Seaway not west of but    
incl Quebec, if Miss Riv not north of but incl B.Rouge, if NY not north of G.W. Bridge, war or warlike areas and any    
country, port or terminal boycotted by the United Nations.    

Vessel never to force ice or follow for breakers.  Any extra or additional insurance premiums which may be levied on    
vessel by Owners' underwriters by virtue of vessel's trading or calling war risk areas to be for Charterers' account.    
Such premium to be  paid soon after Charterers' receipt of Owners reimbursement invoices supported by    
quotation/invoices from Owners' underwriters.    

Owners to permit trading to Chinese River Ports and Inner Berths of Nigeria on a case-by-case only, subject always    
to Owners approval – not to be unreasonably withheld.    

          Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places    73
(which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine    74
lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always    75
afloat. Notwithstanding anything contained in this or any other clause of this charter.  Charterers do not warrant    76
the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss    77
or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded    78
and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to    79
ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out                        in    80
the latest published edition of the ICS/OCIMP Ship-to-Ship Transfer Guide.    81
          The vessel shall be delivered by Owners at a port in    
DLOSP 1 SP UKC Havre-Hamburg range or    82
1 SP EUROMED Neubig excl Albania or    
1 SP AG [excl Iraq] or    
1 SP Korea/Japan Range or    
Ex-yard at Sungdong Shipyard – South Korea or    
ex-yard of New Times Shipyard – China,    83
In owners option    

; Owner's to provide delivery notices of 20/15/10 days of approximate notice and 7/5/3/1 days definite notice.    

at Owners' option and redelivered to Owners at a port in          DLOSP 1 SP UKC Havre Hamburg range or    

1 SP EUROMED Neubig excl Albania or    
1 SP Caribs excl Cuba, Orinoco, Haiti, Cairipito, Maracaibo or    
1 SP UKC if miss riv not north of but incl B.Rouge or    
1SP USAC if NY not north of GW bridge or    
1 SP AG [excl Iraq] – Japan Range    
in Charterers option    

Charterer's to provide re-delivery notices of 20/15/10 days approximate notice and 7/5/3/1 days definite notice    84
at Charterers' option.

Laydays/     5.    The vessel shall not be delivered to charterers before ..Februar.15th 2009    and Charterers shall     85
Cancelling        have the option of cancelling this charter if the vessel is not ready and at their disposal on or before  June 15th 2009     86
                  (to be narrowed as per delivery notice clauses)

Owners to    6.    Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees     87
Provide           and all other expenses of the master, officers and crew; including, but not limited to, launch boat(s) for crew     88
                  services also, except as provided in Clause 4 and 34 hereof, for all

                  Insurance on the vessel, for all deck, cabin and engine-room stores, and for water; (except fresh water used for     89
                  cleaning of tanks between cargoes and/or for Charterer's purposes) for all drydocking, overhaul,     90
                  maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners'
                  obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the     91
                  performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the     92
                  stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall     93
                  refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any     94
                  such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited     95
                  to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire.     96

Charterers to    7.    Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and  pilotage     97
Provide           whether compulsory or not
                  and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal     98

                  dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all     99
                  charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for     100
                  Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or     101
                  distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in     102
                  connection with a general average sacrifice or expenditure shall be paid for by Owners.     103

Rate of     8.    Subject as herein provided, Charterers shall pay for the use and hire of the vessel at  the rate of     104
Hire
                  New Times Vessels:
                  USD 26,000 per day or pro rate including overtime payable 30 days in advance per calendar month

                  Owner's Option for either the Sungdong or New Times vessel up until COB London time on Dec 5th, 2008.
                  Thereafter, if Owners do not exercise a particular vessel, Charterer is to then have the option on the agreed
                  rate/vessel structure by January 1st, 2009.  In the event that Owners declare it to be a Sungdong vessel, the rate to be
                  amended to USD 26,000 per day.

                  per day and pro rate for any part of a day, from the time and date of her delivery  (local
                  time ) Universal Time GMT until the time and date of her redelivery (local time) Universal Time  GMT to Owners.

                  9.    Subject to Clause 3 (iii), payment of hire shall be made in immediately available funds to:     105
                                                                                                                     106

                  Owners to Advise:

Payment of                                                                                                           107
Hire


                  Account
                  in    30 days       per calendar month in advance, less  USD 20 per day payable together with hire for each
                  representative while on board the vessel. Charterers shall give due notice of their intention to send
                  representative(s) on board.  Each Charterers representative shall sign prior to boarding the vessel the visitor's pass
                  as per Owners P&I Club wording.     108
                                                       109

                      (i)    any hire paid which Charterers reasonably estimate to relate to off-hire periods, and
                      (ii)   any amounts disbursed on Owners' behalf, any advances and commission thereon, and
                  charges which are for Owners' account pursuant to any provision hereof, and
                      (iii)  any amounts due or reasonably estimated to become due to Charterers under Clause 3(ii) or     110
                  21 hereof,     111
                  any such adjustments to be made at the due date for the next monthly payment after the facts have been     112
                  ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners'     113
                  account provided that Charterers have made proper and timely payment.
                  In default of such proper and timely payment,
                  (a) Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of     114
                  such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from     115
                  the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise;     116
                  and     117
                  (b) interest on any amount due but not paid on the due date shall accrue from the day after that date     118
                  up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime     119
                  Interest Rate as published by the Chase Manhattan Bank in New York at 12:00 New York time on the due date,     120
                  or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which     121
                  such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded     122
                                                                                                                     123

~~semi-annually in arrear of~~ ........  124
125
126
127
128

Space
Available to
Charterers

10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including  129
Owner's suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master,  130
officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall  131
not, unless specially agreed, exceed   350.   tonnes at any time during the charter period.  132

Overtime

11. ~~Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers'~~  133
~~account when incurred, as a result of complying with the request of Charterers or their agents, for loading,~~  134
~~discharging, heating of cargo, bunkering or tank cleaning.~~  135

Instructions
And Logs

12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and  136
he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as  137
required. The master shall when required furnish Charterers or their agents with a true copy of such log and with  138
properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as  139
Charterers may reasonably require. Charterers shall be entitled to take copies at Owners' expense of any such  140
documents
which are not provided by the master.  141

Bills of
Lading

13. (a)   The master (although appointed by Owners) shall be under the orders and direction of  142
Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as  143
Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter.  144
Charterers hereby indemnify Owners against all consequences or liabilities that may arise  145
(i)   from signing bills of lading in accordance with the directions of Charterers, or their agents, to  146
the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as  147
provided in Clause 19(b)) from the master otherwise complying with Charterers or their agents orders;  148
(ii)   from any irregularities in papers supplied by Charterers or their agents.  149
~~(b)   Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from~~  150
~~Charterers to discharge all or part of the cargo~~  151
~~(i)   at any place other than that shown on the bill of lading and/or~~  152
~~(ii)   without presentation of an original bill of lading~~  153
~~unless they have received from Charterers both written confirmation of such orders and an indemnity~~  154
~~in a form acceptable to Owners. See Additional Clause 46, "Bills of Lading/Indemnity"~~  155

Conduct of
Vessel's
Personnel

14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall  156
immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay,  157
make a change in the appointments and Owners shall in any event communicate the result of their investigations to  158
Charterers as soon as possible.  159

Bunkers at
Delivery and
Redelivery

15. ~~Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on~~  160
~~redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept~~  161
~~and pay for all bunkers remaining on board, at the then current market price at the port of delivery or~~  162
~~redelivery,~~  163
~~as the case may be, or if such prices are not available payment shall be at the then current market price at the~~  164
~~nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a~~  165
~~port, payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the~~  166
~~case~~  167
~~may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time~~
~~to time, if so required by Charterers, provided suppliers agree.~~

Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery
(whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all
bunkers remaining on board at their respective purchase price, which to be supported by vouchers. Bunkers at
delivery and re-delivery to be sufficient to reach nearest bunkering station plus safety margin. In case Charterers
need a bunker survey on delivery / re-delivery, same to be done at their time and expenses. Cost of bunkers on
delivery to be paid with first hire. Upon Owners confirmation (which should not be unreasonably withheld)
Charterers shall have the option to deduct value of bunkers ROB on redelivery from last hire payment on quantity
and value of ROB on reaching intended redelivery port.
Owners to liaise with Kingfish Operations for bunkering vessel prior to delivery on quantities, etc.

Stevedores,
Pilots, Tugs

16. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners  168
from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict  169
account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents  170
against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of  171
pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in  172
the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact  173
the servants of Charterers their agents or any affiliated company) provided, however, that  174
(i)   the foregoing indemnity shall not exceed the amount to which Owners would have been  175
entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and  176
(ii)   Charterers shall be liable for any damage to the vessel caused by or arising out of the use of  177
stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to  178
obtain redress therefor from stevedores.  179

| | | |
|---|---|---|
| Supernumeraries | 17. Charterers may send maximum 2 representatives in the vessel available accommodation upon any voyage made under this charter. Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers paying at the rate of U.S.Dollars 10.00. per day. USD 30 per day, payable together with hire for each representative while on board the vessel. Charterers shall give due notice of their intention to send representative(s) on board. Advising name and passport number. Each Charterers representative shall sign prior to boarding the vessel the visitor's pass as per Owners P&I Club wording. | 180 181 182 |

Sub-letting

18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter.                                                                                183
                                                                                                                                                                              184

Final Voyage

19.  If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before       185
the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of     186
the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers      187
may deduct amounts due or reasonably expected to become due for                                                                  188
          (i)     disbursements on Owners' behalf or charges for Owners' account pursuant to any provision                 189
hereof, and                                                                                                                                        190
          (ii)    bunkers on board at redelivery pursuant to Clause 15.                                                                  191
          Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made            192
good by Charterers.                                                                                                                               193
          If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a the vessel is     194
on a
ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the      195
vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to     196
complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be            197
Charterers without consent of Owners shall not send vessel to final voyage which Charterers reasonably expect to
terminate beyond latest redelivery date provided by this charter party.

| | | |
|---|---|---|
| Loss of vessel | 20.  Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port. | 198 199 200 201 202 203 204 |

Off-hire

21.   (a)     On each and every occasion that there is loss of time (whether by way of interruption in the           205
vessel's service or, from reduction in the vessel's performance, or in any other manner)                                       206
          (i)     due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting          207
to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other major parts of the      208
vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision,          209
stranding, accident or damage to the vessel or any other similar cause preventing the efficient working of the             210
vessel; and such loss continues for more than three consecutive hours(if resulting from interruption in the vessel's        211
service) or cumulates to more than three hours (if resulting from intermittent interruptions in the vessel's service or
from partial loss of service); or
          (ii)    due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the         212
master, officers or crew; or                                                                                                                     213
          (iii)   for the purpose of obtaining medical advice or treatment for or landing any sick or injured            214
person (other than a Charterers' representative) carried under Clause 17 hereof) or for the purpose of landing the        215
body of any person (other than a Charterers' representative), and such loss continues for more than three                   216
consecutive hours; or landing stores, provisions or changing Crew, unless concurrent with other operations, or          217
          (iv)    due to any delay in quarantine arising from the master, officers or crew having had                   218
communication with the shore at any infected area without the written consent or instructions of Charterers or             219
their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local          220
law on the part of the master, officers, or crew; or                                                                                        221
          (v)     due to detention of the vessel by authorities at home or abroad attributable to legal action              222
against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or         223
neglect of Charterers);then                                                                                                                      224
          without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers                       225
hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again          226
ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at         227
which such loss of time commenced; provided, however, that any service given or distance made good by the               228
vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.                          229
          (b)     If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure          230
arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel          231
shall be off-hire under this Clause 21 shall be the difference between                                                                   232
          (i)     the time the vessel would have required to perform the relevant service at such guaranteed             233
speed, and                                                                                                                                         234
          (ii)    the time actually taken to perform such service (including any loss of time arising from              235
interruption in the performance of such service).                                                                                           236
          For the avoidance of doubt, all time included under (ii) above shall be excluded from any                       237
computation under Clause 24.                                                                                                                   238
          (c)     Further and without prejudice to the foregoing, in the event of the vessel deviating (which            239
expression includes without limitation putting back, or putting into any port other than that to which she is bound         240
under the instructions of Charterers ) for any cause or purpose mentioned in Clause 21( a ), the vessel shall be          241
off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state          242
to resume her service from a position not less favourable to Charterers than that at which the deviation                    243

commenced, provided, however, that any service given or distance made good by the vessel whilst on off-hire  244
shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or  245
purpose mentioned in Clause 23 (a), puts into any port other than the port to which she is bound on the  246
instructions of Charterers, the port charges, pilotage and other expenses as such port shall be borne by Owners.  247
Should the Vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and  248
payable during any time lost thereby.  249

(d)  If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such  250
hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof  251
then from the date of receipt by Owners of such notice until the termination of such commercial impracticability  252
the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.  253

(e)  Time during which the vessel is off-hire under this charter shall count as part of charter  254
period. ~~Charterers to declare whether or not off-hire period will be added to the total hire period within 3 working days of the~~  255
~~date the vessel is put back on hire latest 15 days prior to the end of the charter party.~~  256

<table>
<tr><td>Periodical<br>Drydocking</td><td>

~~22.  (a)  Owners  have  the  right  and  obligation  to  drydock  the  vessel  at  regular  intervals  of~~  257
~~——————————— On each occasion Owners shall propose to Charterers a date on which they wish to~~  258
~~drydock the vessel, not less than ———————————— before such date, and Charterers shall offer a port for~~  259
~~such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as~~  260
~~practicable.~~  261
~~——————————— Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers~~  262
~~place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be~~  263
~~responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have~~  264
~~the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of~~  265
~~lading or this charter.~~  266
~~(b)  If a periodical drydocking is carried out in the port offered by Charterers (which must have~~  267
~~suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall~~  268
~~be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to~~  269
~~resume Charterers' service and is at the position of which she went off-hire or a position no less favourable to~~  270
~~Charterers, whichever is first attained. However,~~  271
~~(i)  provided that Owners exercise due diligence in gas-freeing any time lost in gas-freeing to~~  272
~~the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether~~  273
~~lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21) and~~  274
~~(ii)  any additional time lost in further gas-freeing to meet the standard required for hot-work or~~  275
~~entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.~~  276
~~——————————— Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any~~  277
~~calculation under Clause 24.~~  278
~~——————————— The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for~~  279
~~Owners' account.~~  280
~~(c)  If Owners require the vessel, instead of proceeding to the offered port, to every out-periodical~~  281
~~drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to~~  282
~~proceed to the special port until she next presents for loading in accordance with Charterers' instructions~~  283
~~provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at~~  284
~~the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but~~  285
~~Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage~~  286
~~calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any~~  287
~~benefit they may gain in purchasing bunkers at the special port.~~  288
~~(d)  Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of~~  289
~~tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which~~  290
~~Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.~~  291

Vessel not to dry-dock during the duration of this charter party, except in cases of emergency or warranty repairs.

</td></tr>
</table>

<table>
<tr><td>Ship  Inspection</td><td>

23.  Charterers shall have the right at any time during the charter period to make such inspection of the  292
vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in  293
their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all  294
necessary co-operation and accommodation on board provided, however,  295
(i)  that neither the exercise nor the non-exercise, nor anything done or not done in the exercise  296
or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or  297
responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase  298
Charterers' responsibilities to Owners or third parties for the same; and  299
(ii)  that Charterers shall not be liable for any act, neglect or default by themselves, their  300
servants or agents in the exercise or non-exercise of the aforesaid right.  301

</td></tr>
</table>

<table>
<tr><td>Detailed<br>Description<br>And Performance</td><td>

24.  (a)  Owners guarantee that the speed and consumption of the vessel shall be as follows :-  302

</td></tr>
</table>

~~Average speed ——————————————— Maximum average bunker consumption~~  303
~~In knots ————————— main propulsion ——— auxiliaries~~  304
~~——————————— fuel oil/diesel oil ——— fuel oil/diesel oil~~  305
~~Laden ————————————— tonnes ————— tonnes~~  306

"Owners to complete following table".

VESSELS' APPROXIMATE CONSUMPTIONS AS FOLLOWS:

| VESSEL OPERATION | IFO consumed (mt/day) | MDO consumed (mt/day) |
|---|---|---|

| at Average Service Speed | | |
|---|---|---|
| At sea – laden on abt 14/15 kts | Abt 40/46 mts | n/a |
| At sea - in ballast on abt 14/35/16 kts: | Abt 37/37/36 mts | n/a |
| In port - loading: | 8 mts | |
| In port - discharging: | 6S mts | |
| At anchor - idler | 6 mts | 3 mts |
| Add. For heating: | 20 mts | |
| Add. For tank cleaning: | 3 mts per hr | |
| Add for heating/de-inerting: | 3.5 mts per hr | |
| VESSEL SPEEDS: | Laden | Ballast |
| Maximum speed | Abt 15.0 knots | Abt 16.0 knots |
| Slow speed | n/a | n/a |

Above consumptions exclude maneuvering within harbours, inland waterways, canals etc., and are basis good weather, calm seas with no adverse current and wind force not exceeding beaufort 4.

Heating raising basis position and weather prevailing conditions.

Final speed and consumption figures to be adjusted in accordance with vessels actual performance following 3 months trading in accordance with the c/p terms and conditions. No credit due to owner in the event of decreased performance and no claim for under performance.

All details abt as given by yard.

Ballast                                                                                                                          307

      The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning      308
and shall be pro-rated between the speeds shown.

~~The service speed of the vessel is ~ Abt 14.0 knots min Bb4-4 laden and ~Abt 15.0 knots upto Bb4 4 knots in ballast    309~~
~~and in the absence~~                                                                                                            310

~~of Charterers' orders ~ to ~ the contrary the vessel shall proceed at the service speed. However if more than one    311~~
~~laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to    312~~
~~clear out any speed within the range set out in the table (the "ordered speed").~~                                          313

~~If the vessel ~ is ordered to proceed at any speed other than the highest speed shown in the table,    314~~
~~and the average speed actually attained by the vessel during the currency of such order exceeds such ordered    315~~
~~speed plus 0.5 knots (the "maximum recognised speed") then for the purpose of calculating any increase or    316~~
~~decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed    317~~
~~actually attained.~~                                                                                                            318

~~For the purposes of this clause the "guaranteed speed" at any time shall be the    319~~
~~then current ~ ordered speed or the service speed, as the case may be~~ The service speed of the vessel is About    320
14.0 knots Laden and About 15.0 knots in Ballast.

      The average speeds and bunker consumptions shall for the purposes of this Clause 24 be    321
calculated by reference to the observed distance from pilot station to pilot station (all away on sea passage (EAOSP)    322
(till end of sea passage (ESSP) on all sea passages during each
period stipulated in Clause 24 (r), but excluding any time during which the vessel is (or but for Clause 22(b) (i)    323
would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction    324
of speed is necessary for safety in congested waters or in poor visibility and/or travelling coasts, and/or when    325
complying with slow steaming instructions that may have been issued by Charterers (ii) any days, noon to noon,
when winds
exceed force 8.4 on the Beaufort Scale for more than 12 hours.    326

The Charterer shall have the option to have the vessel monitored by 'Ocean Routes' or similar routing service. The
Charterer, who will inform the Master on a case-by-case basis if and when they are using such a service, in order to
maximise the vessel's performance, and shall pay all cost and expenses.  The Master is to follow Ocean Route's
suggestions concerning navigation. The Master, at his reasonable discretion, may not follow suggested route if such
route will cause it threat to the vessel and/or cargo or the performance will not be improved.  In such case the Master
is to describe in detail the reasons for departing from the suggested route. In case such service is used, owners
hereby agree that ocean routes' (or similar) information may be used to give an evaluation of the vessel's
performance and maybe presented as supporting evidence to any performance claim and shall be deemed to be
binding evidence in case of dispute unless owners/disponent owners support evidence from a similar routing
service (one that is independent and internationally recognized) that should contradict the findings of the one
presented by charterers.

~~(b)  If during any year from the date on which the vessel enters service (anniversary to anniversary)    327~~
~~the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess    328~~
~~results    329~~

If at any time following the date upon which the vessel enters into service under this charter the performance of the vessel falls below the performance guaranteed in Clause 24 (a) as amended then, if such shortfall results,

(i) from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid;    330 331 332

(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24 (a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid.    333 334 335 336

The addition to or deduction from hire as calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total addition to or deduction from hire to be made for such period. Any overperformance to be credited against any underperformance if any.    337 338 339 340 341

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers.    342 343

(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to Owners as the case may require.    344 345 346 347 348 349

Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers of all the information necessary to calculate such increase. Over-performance not to be claimed by the owner's.    350 351 352

**Salvage**

25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25.    353 354 355 356

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share.    357 358 359

**Lien**

26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter.    360 361 362

**Exceptions**

27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however that Clauses 1,2,3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people.    363 364 365 366 367 368 369 370 371 372

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.    373 374

(c) Clause 27 (a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in respect of    375 376

(i) loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or    377 378 379

(ii) any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hamburg Rules or the Hague    380 381

Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading ( whether or not such Rules were so incorporated ) or, if no such bill of lading is issued, to the Hague-Visby Rules, unless Hamburg Rules compulsorily apply in which case the Hamburg Rules apply.    382 383 384

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.    385 386

**Injurious Cargoes**

28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.    387 388 389 390

**Grade of Bunkers**

29. Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of 380 Centistokes at 50 degrees Centigrade/ACCFO for main-propulsion and diesel oil/ACCFO for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.    391 392 393

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality    394

complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading 395
Company and with its specification for marine fuels as amended from time to time. 396
See Additional Clause 68, "Bunkers"

**Disbursements**   30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents 397
shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per 398
cent, and if such advances and commission shall be deducted from hire. See Additional Clause 71, "Ship Agents." 399

**Laying-up**   31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the 400
vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be 401
adjusted to reflect any net increases in expenditure reasonably actually incurred or any net saving which should 402
reasonably actually be made by Owners as a result of such lay-up. Charterers may exercise the said option any 403
number of
times during the charter period. 404

**Requisition**   32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, 405
the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in 406
respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of 407
the charter period. 408

**Outbreak of War**   33. If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R., C.I.S / 409
Federal Republic of Russia, Singapore, Switzerland,
P.R.C., U.K., Netherlands both Owners and Charterers shall have the right to cancel this charter including any 410
countries whose flag is relevant to this contract.

However, neither party shall be entitled to terminate this charter party on account of minor and/or local war like 
operations which shall not interfere with vessels trade. Such cancellation to be declared within a period of twenty 
days from the date in which the hull & machinery Insurers officially report the outbreak of war.

**Additional War Expenses**   34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war in so far 411
as such areas have been declared as war risk areas by Lloyd's of London.
Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which

If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war and provided 412
Owners can obtain acceptable insurance cover after Owners consent is given, Charterers shall reimburse Owners for 
any additional insurance premia (including Hull & Machinery), crew bonuses and other expenses which 
are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of 
such expenses as soon as practicable and in any event before such expenses are incurred, and provided further 413
that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any 414
claims by Owners under their own risk insurance arising out of compliance with such orders. "Charterers is under no 
circumstances whatsoever to be liable for any loss, damage or expense which is, or could be, covered by war risks 415
insurance available commercially." 416

**War Risks**   35. (a)   The master shall not be required or bound to sign bills of lading for any place which in his or 417
Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, 418
war, hostilities, warlike operations, civil war, civil commotions or revolutions. 419
(b)   If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in 420
Clause 35 (a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach 421
or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter 422
(a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and 423
Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or 424
discharged, as the case may be, at any other place within the trading limits of this charter (provided such other 425
place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been 426
received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at 427
liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in 428
their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due 429
fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.
(c)   The vessel shall have liberty to comply with any directions or recommendations as to departure, 430
arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever 431
given by the government of the state under whose flag the vessel sails or any other government or local authority 432
or by any person or body acting or purporting to act as or with the authority of any such government or local 433
authority including any de facto government or local authority or by any person or body acting or purporting to 434
act as or with the authority of any such government or local authority or by any committee or person having under 435
the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by 436
reason of or in compliance with any such directions or recommendations anything is done or is not done, such 437
shall not be deemed a deviation. 438
If by reason of or in compliance with any such direction or recommendation the vessel does not 439
proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed 440
to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part 441
of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this 442
charter so far as cargo so discharged is concerned. 443
Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of 444
Shipping War Risks Clause 1952. 445
446

**Both to Blame Collision Clause**   36. If the liability for any collision in which the vessel is involved while performing this charter falls to be 447
determined in accordance with the laws of the United States of America, the following provision shall apply: 448
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any 449

act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the    450
management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or    451
liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or    452
damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying    453
ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying    454
ship or her owners as part of their claim against the carrying ship or carrier."    455

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship    456
or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or    457
contact."    458

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the    459
foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be    460
determined in accordance with the laws of the United States of America.    461

New Jason
Clause

37.  General average contributions shall be payable according to the York/Antwerp Rules, 1974-1994, and shall    462
be adjusted in London in accordance with English law and practice but should adjustment be made in accordance    463
with the law and practice of the United States of America, the following provision shall apply:    464

"In the event of accident, danger, damage or disaster before or after the commencement of the    465
voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the    466
consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers,    467
consignees, or owners of the cargo shall contribute with the carrier in general average to the payment of any    468
sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and    469
special charges incurred in respect of the cargo."    470

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said    471
salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover    472
the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by    473
the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."    474

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the    475
foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and    476
practice of the United States of America.    477

Clause
Paramount

38.  ~~Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the~~    478
~~following clauses:~~    479

~~"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by and have effect subject~~    480
~~to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of~~    481
~~Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed~~    482
~~at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be~~    483
~~deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his~~    484
~~responsibilities or liabilities under the Hague-Visby Rules.~~    485

~~(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading,~~    486
~~to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules.~~    487
~~Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities~~    488
~~or an increase of any of his responsibilities or liabilities under the Hague Rules."~~    489

~~"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules it~~    490
~~applicable, such term shall be void to that extent but no further."~~    491

~~"(4)  Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the~~    492
~~right of any relevant party or person to limit his liability under any available legislation and/or law."~~    493

_New Paramount:_

The Charterer shall endeavour to ensure that all Bills of Lading issued pursuant to this charter shall contain the
following clauses:

1. Subject to sub-clause (2) or (3) hereof, this Bill of Lading shall be governed by, and have effect subject to, the
rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading
signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels
on 23rd February 1968 (hereafter the "Hague Visby Rules").
Nothing contained herein shall be deemed to be either surrender by the carrier of any of his rights or immunities, or
any increase of any of his responsibilities or liabilities under the Hague-Visby Rules.

2. If there is governing legislation that applies the Hague Rules compulsorily to this Bill of Lading to the exclusion
of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hague Rules. Nothing herein
contained shall be deemed to be either surrender by the carrier of any of his rights or immunities, or an increase of
any of his responsibilities or liabilities under the Hague Rules.

3. If there is governing legislation that applies the Hamburg Rules compulsorily to this Bill of Lading to the
exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hamburg Rules.
Nothing herein contained shall be deemed to be either surrender by the carrier of any of his rights or immunities, or
an increase of any of his responsibilities or liabilities under the Hamburg Rules.

If any term of this Bill of Lading is repugnant to the Hague-Visby Rules, or Hague Rules or Hamburg Rules, if
applicable, such term shall be void to that extent, but no further. Nothing in the Bill of Lading shall be constructed
as in any way to restrict, exclude or waive the right of any of the relevant parties or person to limit liability under
any available legislation and/or law.

TOVALOP

39.  Owners warrant that the vessel is    494
(i)    a bunker in TOVALOP RYE and    495
(ii)   properly entered in        North of England        P & I Club    496

and will so remain during the currency of this charter. 497

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution 498
Damage or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the 499
escape or discharge of Oil which if it occurred, would create a serious danger of Pollution Damage whether or 500
not an escape or discharge in fact subsequently occurs) then Charterers may, at their option, upon notice to 501
Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution 502
Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners 503
advised of the nature and result of any such measures taken by them and, if time permits, the nature of the 504
measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be 505
deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that: 506

(1) any such escape or discharge or Threat was caused or contributed to by Charterers; or 507

(2) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International 508
Convention on Civil Liability for Oil Pollution Damage, Owners or on bail the said Convention applied to such 509
escape or discharge or to the Threat, would have been exempt from liability for the same; or 510

(3) the cost of such measures together with all other liabilities, costs and expenses of Owners arising 511
out of or in connection with such escape or discharge or Threat exceeds one-hundred-and-sixty United States 512
Dollars (US $160 ) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States 513
Dollars (US $16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such 514
excess under either the 1971 International Convention on the Establishment of an International Fund for 515
Compensation for Oil Pollution Damage or under CRISTAL; 516

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures 517
should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to 518
continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this 519
Clause 39 shall thereupon cease. 520

The above provisions are not in derogation of such other rights as Charterers or Owners may have 521
under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP. 522

The term "TOVALOP" means the Tanker Owners Voluntary Agreement Concerning Liability 523
for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the 524
Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as 525
amended from time to time. The terms "Oil", "Pollution Damage", and "Tonnage" for the purposes of this 526
Clause 39 have the meanings ascribed to them in TOVALOP. See Additional Clause 31, "Classification/P & I/TOPF". 527

**Export Restrictions**

40.  The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to 528
which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was 529
produced and/or shipped. 530

Charterers shall procure that all bills of lading issued under this charter shall contain the following 531
clause: 532

"If any laws rules or regulations applied by the government of the country in which the cargo was 533
produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo 534
to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to 535
require cargo owners forthwith to nominate an alternative discharge place for the discharge of the 536
cargo, or such part of it as may be affected, which alternative place shall not be subject to the 537
prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and 538
discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 539
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be 540
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place 541
on which they or the master may in their or his absolute discretion decide and which is not subject to the 542
prohibition, and such discharge shall constitute due performance of the contract contained in this bill 543
of lading so far as the cargo so discharged is concerned." 544

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading 545
being deemed to be references to this charter. 546

Law and
Litigation

41.   (a)   This charter is to be construed and the relations between the parties determined in accordance with the laws of England.   547   548

(b)   Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree.   549   550

(c)   Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.   551   552   553   554   555

(i)   A party shall lose its right to make such an election only if   556

(a)   it receives from the other party a written notice of dispute which —   557

(1)   states expressly that a dispute has arisen out of this charter;   558

(2)   specifies the nature of the dispute; and   559

(3)   refers expressly to this clause 41(c)   560

and   561

(b)   it fails to give notice of election to have the dispute referred to arbitration not later than   562
30 days from the date of receipt of such notice of dispute.   563

(ii)   The parties hereby agree that either party may —   564

(a)   appeal to the High Court on any question of law arising out of an award;   565

(b)   apply to the High Court for an order that the arbitrator state the reasons for his award;   566

(c)   give notice to the arbitrator that a reasoned award is required; and   567

(d)   apply to the High Court to determine any question of law arising in the course of the reference.   568   569

(d)   It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay. See Additional Clause 49 "Law and Litigation."   570   571   572   573

Construction

42.   The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.   574   575

IN WITNESS WHEREOF, The parties have caused this charter to be executed in duplicate the day and year herein first above written.

Owners
Owners to Advise

Charterers
Kingfish Services Limited

Oil Majors for the purpose of this clause shall be considered to be BP, Chevron, Exxonmobil, Statoil, Shell, Total. It is a condition that owners comply with all provisions in this clause.

## Newbuildings

i)    At the date of delivery Owners guarantee to have:-
  - completed the BP new build questionnaire on line.
  - to have made best endeavours to arranged for Shell or Statoil to inspect the vessel at the shipyard and/or at the vessel's first bunkering and that this report has been entered into the SIRE system.

## SIRE

ii)    Owners guarantee that a valid SIRE report will be registered on the SIRE system within 45 days after delivery (but always providing at least 2 discharge ports) and always providing oil majors have an inspector available at such discharge ports and subject timely reply, confirmation of inspection report received by major vetting companies. Thereafter, Owners to ensure that the vessel has a valid SIRE report at all times throughout the currency of this charterparty.

To be a valid SIRE report:-
  - The report must not contain any "BP High risk" deficiencies (as defined in the "High Risk" Observations list issued by BP dated 21st June 2007)
  - No Oil Major shall have rejected the vessel since the inspection leading to the current valid SIRE report registered on the SIRE system.
  - The SIRE report must be no more than 4 months old if the vessel is more than 15 years old and for all other vessels, the SIRE report must be no more than 6 months old
  - The Vessel's Operator listed in the SIRE report must not have changed.
  - None of the Certification listed in section 2 of the SIRE report shall be/ have become out of date.

## Oil Major Approvals

iii)    Owners further warrant that:-

  a. The vessel shall have, at the date of delivery under this charterparty the acceptance of at least three Oil Majors at all times ("delivery approvals"). This clause v (a) does not apply to newbuildings.

  b. Owners shall exercise best endeavours to obtain as soon as possible thereafter approvals from the remaining Oil Majors and upon Charterers request approvals from any other parties

c.  ~~If Owners become aware that the vessel is unacceptable to any Oil
Major, they must advise Charterers at once and must exercise best
endeavours to reinstate acceptability within 30(thirty) days from such
occurrence,   but always providing oil majors have an inspector
available at discharge ports and subject timely reply, confirmation
received from major vetting companies.~~

Irrespective of an inspector being available, in the event that 45 days pass
and the vessel is unacceptable to any major then there is to be a mutually
agreeable charter rate to cover the remaining period the vessel is approved,
or alternatively the vessel will be redelivered to Owners until such a time the
issue has been rectified.

d.  The vessel shall at all times comply with Oil Major crew matrix
requirements.

iv)  In the event of any disagreement between owners and charterers as to
whether the vessel has an approval, owners to immediately provide
charterers on their request with all correspondence exchanged with the
approving party.

v)  The vessel shall be deemed not to have approval if the approving party
needs to carry out it's own physical inspection of the vessel. Advice by
the approving party that it will refer to the registered valid SIRE report
is evidence that such a physical inspection is not required but is not
evidence that the vessel is acceptable to the approving party.

vi)  Owners        to        advise        charterers        about        any
incidents/accidents/casualties/structural  problems/fleet  holds  or  any
other issues of any kind whatsoever which may effect approvals.

vii)  If, in order to obtain such approval, an Oil Major needs to carry out an
inspection of the vessel, the cost of such an inspection plus any time
lost in order to effect and as a result of that inspection shall be for
owners account.

viii)  If Owners fail to comply with their obligations in this clause, then
charterers will have the option to:-
  * ~~place the vessel off-hire until such time as Owners are again compliant
with their obligations, and/or~~
  * at any time whilst Owners are in anyway in breach of their obligations,
to cancel the charter, without penalty to either party by giving owners a
minimum 30 days redelivery notice with redelivery ~~within the
charterparty trading range.~~ as agreed elsewhere herein.

DYNACOM / KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED – November 25th, 2008
ADDITIONAL CLAUSES

## 43) Private and Confidential

This fixture and any details thereof to be kept absolutely private and confidential by both parties.

## 44) Description

A) Vessel's Particulars Questionnaire (VPQ)

Prior to the date of fixture delivery, and Owners to make reasonable endeavours to provide as soon as possible, Owners must provide a completed VPQ and Q88. and prior to date of delivery and throughout the duration of this Charter Party Owners undertake to subscribe to the services provided by "Q88.com" (www.Q88.com), an Internet facilitator of VPQ data processing. The VPQ and web version of the Q88 will form an integral part of this Charter Party and Owners guarantee the accuracy of the information therein at all times throughout the duration of this Charter Party.

Should any changes be necessary Owners are to advise Charterers of the changes beforehand and, where such changes are agreed, provide an updated VPQ and Q88.

B) Information and Documents

Owners are to provide the following information and copy documents:

i) Information required before / on delivery

a) Ships contacts details
b) Owners contact details, including DPA & after office hours contact details
c) Expected bunkers remaining on board on delivery and bunker tanks capacities
d) Last three cargos (mtbc content required, if any)
e) Expected slops remaining on board on delivery
f) Vessel itinerary / schedule (to be advised at time of fixture)
g) Hull and machinery value
h) Details of cargo groups / segregations

ii) Documentation (copies) required before / on delivery

a) Q88
b) ISPS / ISSC certificate.
c) Owners P&I certificate of entry
e) CLC certificate.
f) Copies of last bunker invoices prior to delivery
g) On hire certificate
h) IOPP certificate – Form B
i) Owner's P&I club standard Letter of Indemnity wording (see clause 46)

iii) Information and documents required upon specific request of Charterers

a) Tanker Management & Self Assessment (TMSA) report
b) DOC, SMC and interim DOC and SMC
c) Load Lines Certificate

**DYNACOM / KINGFISH SERVICES LIMITED**
TIME CHARTER PARTY DATED – November 25th, 2008
ADDITIONAL CLAUSES

d) Ship's deadweight scale
e) Details of existing alternative deadweights and drafts
f) Class quarterly listing of surveys
g) Conditions and Memoranda of Class
h) Executive hull summary from last Special Survey
i) Condition Assessment Scheme (CAS) survey report
j) Condition Assessment Program (CAP) certificate – hull, cargo & machinery
k) Class survey reports
l) Port State reports
m) Inmarsat C details (make, model, number, version, serial number etc.)

C) Ship Inspection Report Programme (SIRE)
~~Owners warrant that a valid SIRE report is available on the SIRE database at all times throughout the duration of this Charter Party. A valid SIRE report is one that has been submitted in accordance with the latest requirements of OCIMF & SIRE, given the age and characteristics of the vessel.~~

D) Tanker Management & Self Assessment (TMSA)
Owners warrant that they and/or their technical managers have completed the TMSA online tool questionnaire within the OCIMF, SIRE website and that this will be maintained and updated throughout the duration of this Charter Party. The most current completed report will be provided to Charterers immediately upon request.

E) LOA Clause for New Times Vessels:

Owner to ensure prior to delivery, the LOA in all descriptions/specifications will be max 228.00 m.

## 45) Address Commission

~~1.25 (one and a quarter) per cent address commission on hire which Charterers at liberty to deduct from hire payments.~~

1.25 % to Poten & Partners -- to be subtracted from the daily hire rate

## 46) Bills of Lading /Indemnity

Discharging port(s) or range(s) as shown in Bill(s) of Lading are not to constitute a declaration of discharging port(s) or range(s) and Charterers have the right to order the vessel to any port within the terms of this charter.

a) In the event that bills of lading are not available at the discharge port at which the vessel has been instructed to discharge, or the discharge port to which the vessel is being instructed to proceed to discharge is different from the port stipulated in the Bill(s) of Lading, then owners shall nevertheless discharge the cargo carried by the vessel in compliance with instructions from Charterers in consideration of their invoking an receiving a letter of indemnity as per Owners' standard P&I club wording for such indemnities. Such letter of indemnity to be signed by Charterer and countersigned by first-class bank or Charterer's P&I Club. Wording of Owners standard P&I Club working to be as the attachment. However if during the course of

2

DYNACOM/KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED – November 25th, 2008
ADDITIONAL CLAUSES

this C/P, the P&I Club recommends to change the wording, Owners to have the right to revise the wording. The wording for such letters of indemnity are to have been provided by Owners prior to delivery under this Charter Party and the indemnity (ies) are deemed to have been issued by Charterers and, therefore, to be in full force and effect on each and every occasion when discharge as aforesaid takes place. Either party, by giving the other prior written notice, may terminate these letters of indemnity. Any such termination not to affect letter(s) of indemnity deemed to have been given prior to termination.

The following information, given in the voyage/discharge instructions to the vessel for each voyage, shall be deemed incorporated in the letter of indemnity, wherefore no additional telex or otherwise written advice from Charterers to Owners shall be required to invoke this letter of indemnity:

(a) quantity - (here it is deemed to be inserted the quantity of cargo carried by the vessel to the discharge port in question under the relevant bills(s) of lading)

(b) description (here it is deemed to be inserted the description of cargo carried by the vessel to the discharge port in question under the relevant bills(s) of lading)

(c) vessel's name

(d) receiver's name

Any indemnity so invoked shall automatically be null and void upon presentation of all the relevant Bill of Lading, - provided no claims, or 13 (Thirteen) months after completion of discharge of cargo to which such indemnity is relevant.

Charterer's to be able to invoke LOIs.

## 47) Unique Bills of Lading

Owners warrant that they are registered for the use of unique Bills of Lading identifiers and will apply a suitable code to all Bills of Lading issued for trading into the United States of America.

## 48) Taxes

All taxes and dues on the vessel and on charter hire to be for the Owners' account unless a direct result from Charterers' orders/trade where such costs are for their account.

Additional taxes, dues, charges and expenses due to vessel's flag shall be for Owners' account, and Charterers shall have the right to deduct such expenses from hire.

Any taxes and/or dues on cargo/vessel and/or freight/hire to be for Charterers' account and to be settled directly by tem.

All taxes and/or dues on cargo and/or vessel and/or hire those related to Charterers voyage(s) and/or port(s)/country(s) of call to be for their account and paid by them. However, taxes levied on hire (income taxes) in Owners country of residence and/or flag state of the vessel to be for Owners account

3

DYNACOM / KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED – November 25th, 2008
ADDITIONAL CLAUSES

## 49) Law and Litigation

This Charter Party shall be construed and the relations between the parties determined, in accordance with the Laws of England.

Any dispute arising out of or in connection with this Charter Party, involving amounts in excess of ~~United States Dollars Fifty Thousand~~ (US$ 200,000), shall be subject to the jurisdiction of the ~~English High Court~~ London Arbitration.

Any dispute arising out of or in connection with this Charter Party involving amounts up to and including ~~United States Dollars Fifty Thousand~~ (US$ 200,000), shall be referred to arbitration by a single arbitrator in London in accordance with the provisions of the London Maritime Arbitrators Association (LMAA) Small Claims Procedure.

## 50) Third-Party Arrest

In the event of arrest (by party other than authorities at home or abroad – refer to Clause 21 (a)(v)) or other sanction levied against the vessel or Charterers arising out of Owners' breach or any fault of Owners, Owners agree to assume full responsibility for all penalties and the vessel shall be considered off-hire during any delay or detention arising there from.

~~In the event of arrest or other sanction levied against the vessel or Charterers arising out of Owners' breach or any fault of Owners, Charterers shall be entitled, in Charterers' option, to terminate the Charter Party. Termination or failure to terminate shall be without prejudice to any claim for damages Charterers may have against Owners.~~

## 51) Classification / P & I / ITOPF

It is a condition of this Charter Party that throughout the duration of this Charter Party, the vessel will be:

   a) Classed by the following Classification Society, which Owners guarantee to be a member of the International Association of Classification Societies: ABS [Owners to state].

   b) Entered in the following Protection and Indemnity (P&I) Club, which Owners guarantee to be a full member of the International Group of P&I Clubs in both protection and indemnity classes: "North of England"[Owners to state].

   c) Owned or demise chartered by a member of the International Tanker Owner's Pollution Federation Limited.

## 52) Civil Liability Convention

It is a condition of this Charter Party that the vessel performing under this Charter Party carries onboard an original certificate furnished as evidence of insurance pursuant to Article 7 of the International Convention of Civil Liability for Oil Pollution Damage 1969 and any subsequent amendments/conventions/protocols thereto that come into force, including but not limited to the 1992 Protocol to amend the 1969 Civil Liability Convention and the 2000 amendments to the 1992 Protocol.

The said certificate will be maintained in effect throughout the duration of this Charter Party. Any delays, costs or consequences due to failure to have or to maintain said

4

**DYNACOM/ KINGFISH SERVICES LIMITED**
TIME CHARTER PARTY DATED – November 25th, 2008
ADDITIONAL CLAUSES

certificate to be for Owners' account and any delays shall be considered as off hire.

## 53) Detention

Should the vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers' use and all extra expenses shall be for the Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their agent(s), or by reason of cargo carried.

## 54) Excess Berth Occupancy

If after disconnection of hoses vessel remains alongside berth exclusively for vessel's purposes, Owners shall be responsible for direct and/or indirect costs charged to Charterers by terminal/suppliers/receivers/port authority and all delays shall be considered as off hire.

## 55) Drug and Alcohol Policy

Owners warrant that they have a policy on drug and alcohol abuse ("Policy") applicable to the vessel, which meet or exceeds the standards in the Oil Companies International Marine Forum (OCIMF) Guidelines, for the control of drugs and alcohol on board ship. Under the policy, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the policy should be that the frequency of the unannounced testing be adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through combined programme of unannounced testing and routine medical examinations.

Owners further warrant that the policy will remain in effect throughout the duration of this Charter Party and that Owners shall exercise due diligence to ensure that the policy is complied with. It is understood that an actual impairment or any test finding of impairment shall not in and of itself mean that Owners has failed to exercise due diligence.

Owners confirm that they have signed and sent to Exxon a blanket declaration confirming that the vessel is included in Owners' policy concerning drugs and alcohol, and that this policy includes unannounced testing according to OCIMF/ EXXON guidelines.

## 56) Oil Major Approvals

~~Owners advise that the vessel at time of fixing is approved by ExxonMobil, TotalFinaElf, Chevtex, ConocoPhilips, AGIP, BPAmoco, Shell.~~

~~Owners warrant that the vessel will maintain the above approvals and take steps to obtain~~

"_____"
~~(further Company(ies) to be advised by Charterers) approvals, which should be completed soonest possible after date of delivery, for the duration of this Charter Party provided that trade and time allows. Time and expenses for vetting shall be borne by Owners unless otherwise agreed.~~

6

## DYNACOM/ KINGFISH SERVICES LIMITED
### TIME CHARTER PARTY DATED November 25th, 2008
### ADDITIONAL CLAUSES

~~Owners will have the vessel regularly vetted in co operation with Charterers and vessel's schedule by major oil companies. If vessel becomes blacklisted and/or boycotted and/or un preferred by oil companies hindering vessel's free trade within the trading limits of the Charter Party, Owners shall immediately take steps to rectify the deficiencies. Charterers shall have the option of either cancelling the charter party or declaring vessel off hire during period(s) where the vessel is blacklisted and/or boycotted and/or un preferred by 2 (two) or more oil companies hindering vessel's free trade under the Charter Party.~~

~~Owners are to notify Charterers immediately there is any change in status of vessel's approvals i.e. whether approvals are lost or gained.~~

As per attached new clause provided

## 57) International Transport Workers Federation

Owners guarantee that the employment of the vessel's officers and crew is covered by a bona fide trade union agreement acceptable to the International Transport Workers Federation (ITF) worldwide and will remain so during the duration of the Charter Party. Vessel is to carry such ticket on board during the service.

In the event that the vessel is delayed by strikes, labour boycotts or any other discrimination/difficulties against the vessel because of previous trade and/or ownership and/or flag and/or officers and crew and/or officers and crews employment condition, all such time lost and expenses incurred thereby are to be for Owners' account incl. bunker fuel consumed during such periods.

## 58) United States

### A. United States Coast Guard

It is a condition of this Charter Party that throughout the duration the vessel will fully comply, and if not in compliance will hold necessary waivers, with all applicable United States Coast Guard (USCG) Regulations in effect including, but not limited to, pollution and safety regulations of the Code of Federal Regulations, as amended, and all other applicable state pollution and safety laws, rules and regulations as may be promulgated and subsequent amendment thereto. Any delays, penalties, costs and consequences resulting from vessel's non-compliance shall be treated as off-hire.

The vessel to have valid certificate complying to the regulations at all times throughout the duration of this Charter Party.

Without limitation to Charterers' remedies under this clause, Owners shall indemnify the Charterers for any losses, penalties, damages and expenses directly/indirectly attributed to vessel's non-compliance with this clause and any delays shall be considered as off hire.

~~If any element of this clause is breached Charterers shall be entitled, in Charterers' option, to terminate the Charter Party. Termination or failure to terminate shall be without prejudice to any claim for damages Charterers may have against Owners.~~

In the event of this situation becoming un-rectifiable, Charterers to have the option of cancelling the Charter.

Any time during which vessel awaiting USCG TVEL inspection and until such time

6

**DYNACOM/ KINGFISH SERVICES LIMITED**
**TIME CHARTER PARTY DATED – November 26th, 2008**
**ADDITIONAL CLAUSES**

as she has secured TVEL certificate, as well as any other associated delays, will be considered off-hire.

B. U.S. automated manifest system (AMS)

1. Owners warrant that they are aware of the U.S. Bureau of Customs and Border Protection (CBP) regulations for entering U.S. ports, including, but not limited to, these regulations issued on 5th December 2003 under Federal Register Part II Department of Homeland Security 19 CFR Parts 4, 103, et al, and Owners further warrant that they will fully comply with the regulations of the CBP.

In respect of cargo loaded for the U.S. or in transit on the vessel through the U.S., including any U.S. territory, the Owners shall be considered "Carriers" for the purpose of the CBP regulations and be responsible for, inter alia, the following items:
   i. filing the vessel manifest electronically via the Vessel Automated Manifest System ("Vessel AMS");
   ii. obtaining a "Standard Carrier Alpha Code" ("SCAC"); and
   iii. obtaining an "international carrier bond" ("ICB").

2. Cargo Destined for the U.S.:

2.1 If loading cargo destined for the U.S., the Charterers shall at Owners' request, which is to be made not later than four London working days in advance of the ETA at the first U.S. port of call, provide to Owners any information, that is not already available to Owners, to enable Owners to complete the CBP Form 1302 and to submit a timely and accurate automated cargo manifest via the Vessel AMS directly to the CBP.

2.2 Provided that the Charterers give to the Owners all information requested as above (2.1), the Owners shall submit the cargo manifest to the U.S. Customs latest 24 hours in advance of the arrival of the vessel at the first U.S. port of call.

3. Foreign Remaining on Board ("FROB"):

If loading cargo carried on the vessel in transit to a foreign destination, the Charterers shall, in respect of all cargoes carried on the vessel through U.S. ports in transit, provide to the Owners any requested information as provided for in 2.1.

Provided that the Charterers give to the Owners all information requested as above (2.1), the Owners shall submit the cargo manifest to the U.S. Customs latest 24 hours in advance of the arrival of the vessel at the first U.S. port of call.

4. Costs, Expenses, Penalties, Delays, Etc.:

The Charterers shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with its obligations under this Clause. Any delays arising from the Charterers' failure to comply with its obligations under this Clause shall count as time 'on hire'.

The Owners shall assume liability for and shall indemnify, defend and hold harmless the Charterers against any loss and/or damage and/or delay (which shall count as time 'off hire') and/or any expenses, fines, penalties and all other claims

7

DYNACOM / KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED ~ November 25th, 2008
ADDITIONAL CLAUSES

~~of whatsoever nature, including but not limited to legal costs, arising from the Owners' failure to comply with its obligations under the CBP rulings for entering and/or transiting U.S. Ports.~~

## AMS CLAUSE FOR TIME CHARTER PARTIES (BIMCO)

a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## C. United States Oil Pollution Act of 1990 (OPA-90)

It is a condition of this Charter Party:

1. That the Owners and/or the vessel operator has submitted to the United States Coast Guard for approval a response plan for the vessel (VRP) which meets in full the requirements of the United States Oil Pollution Act of 1990, the Government Regulations issued thereunder and any change, rule or regulation in substitution of, or supplementary to, such Circular (collectively 'VRP Requirements').

2. That the VRP is approved and the vessel is operated in compliance therewith, when and as required by the VRP requirements.

3. That the Owners or operator of the vessel, and the vessel, fully meets all other requirements of OPA and any Governments Regulations or guidelines issued thereunder.

8

DYNACOM/ KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED – November 25th, 2008
ADDITIONAL CLAUSES

This clause does not in any way lessen the overall effect of the Owners of any State obligation in respect of Vessel Response Plans or other pollution requirements.

Without limitation to Charterers' remedies under this clause, Owners shall indemnify the Charterers for any losses, penalties, damages and expenses directly/indirectly attributed to vessel's non-compliance with this clause and any delays shall be considered as off hire.

~~If any element of this clause is breached Charterers shall be entitled, in Charterers' option, to terminate the Charter Party. Termination or failure to terminate shall be without prejudice to any claim for damages Charterers may have against Owners.~~

## 59) International Safety Management (I.S.M.) Code

It is a condition of this Charter Party that a 'Safety Management System (SMS)' in accordance with the 'ISM Code' will be in operation throughout the duration of this charter. It is a condition of this Charter Party that from 1st July 1998 and onwards thereafter the Owners or "the Company" (as defined by the ISM Code) shall have a valid 'Document Of Compliance (DOC)' and the vessel shall have a valid 'Safety Management Certificate(SMC)'. Copies of the valid DOC and SMC must be on board the vessel at all times. Upon request the Owners shall provide a true copy of the relevant DOC and SMC to the Charterers.

Without limitation to Charterers' remedies under this clause, Owners shall indemnify the Charterers for any losses, penalties, damages or expenses directly/indirectly attributed to vessel's non-compliance with the ISM code and/or to Owners' failure to respond (or delay in responding) to Charterers' request for the foregoing certificates and any delays, to the extent arising from such non-compliance or failure/delay in responding, shall be off hire.

In case of vessel's non-compliance and/or in case of Owners' failure to respond (or delay in responding beyond 2 London banking days) Charterers shall be entitled, in Charterers' option, to terminate the Charter. Termination or failure to terminate shall be without prejudice to any claim for damages Charterers may have against Owners.

## 60) International Ship and Port Facility Security (ISPS) Code

(a) (i) ~~The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).~~

(ii) ~~Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).~~

(iii) ~~Losses, damages, expenses or delays (which shall count as time 'off hire'), excluding consequential losses, damages, expenses or delays, caused by failure on the part of the Owners or "the Company"/"Owner" to comply with~~

9

## DYNACOM / KINGFISH SERVICES LIMITED
### TIME CHARTER PARTY DATED – November 25th, 2008
### ADDITIONAL CLAUSES

the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

(ii) Losses, damages or expenses (excluding consequential losses, damages or expenses) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused by such failure shall count as time 'on hire'.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, and/or that the measure imposed by the port facility or by relevant authorities applies to all vessels in that port and not specifically to Owners' vessel, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

(iii) Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

(d) All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e) If either party makes any payment, which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## ISPS CLAUSE FOR TIME CHARTER PARTIES (BIMCO)

a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The

10

**DYNACOM/ KINGFISH SERVICES LIMITED**
TIME CHARTER PARTY DATED — November 25th, 2008
ADDITIONAL CLAUSES

Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision: "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## 61) Protocols and Certificates

It is a condition of this Charter Party that throughout the period of this charter the vessel shall comply with the requirements of SOLAS (IMO Protocol of 1978 relating to the International Convention for the Safety of Life at Sea, 1974) and MARPOL (IMO Protocol of 1978 relating to the International Convention for the Prevention of Pollution from Ships, 1973) and subsequent updates. Owners further guarantee that with particular reference to these protocols, the vessel shall have on board necessary certification of compliance to enable the vessel to trade without restriction.

In no case shall Charterers be liable for loss of time and/or other expenses as a result of Owners' failure to obtain or maintain the aforementioned certificates.

Without limitation to Charterers' remedies under this clause, Owners shall indemnify the Charterers for any losses, penalties, damages and expenses directly/indirectly attributed to vessel's non-compliance with this clause and any delays shall be considered as off hire.

If any element of this clause is breached Charterers shall be entitled, in Charterers' option, to terminate the Charter Party. Termination or failure to terminate shall be without prejudice to any claim for damages Charterers may have against Owners.

51

DYNACOM / KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED ~ November 25th, 2008
ADDITIONAL CLAUSES

In the event of this situation becoming un-rectifiable, Charterers to have the option of cancelling the Charter. .

## 62) Strikes/Stoppages/Boycott / Black list

In the event of the vessel being delayed, or rendered inoperative by strikes, labour stoppages, or any other difficulties arising from vessel's flag, ownership, crew, or terms of employment of crew (see clause 57), or of chartered vessel or any other vessel under the same ownership, operation or control, such time lost is to be considered as off-hire and all expenses incurred thereby, including fuel consumed during such periods, to be for Owners' account.

It is a condition of this Charter Party that, throughout the duration of this Charter Party, none of the vessel, owners, managers or operators are on any blacklist or boycott list (including but not limited to the Arab League Boycott list) hindering or preventing vessel's free trading as provided for within this Charter Party.

Without limitation to Charterers' remedies under this clause, Owners shall indemnify the Charterers for any losses, penalties, damages and expenses directly/indirectly attributed to vessel's non-compliance with this clause and any delays shall be considered as off-hire.

~~If any element of this clause is breached Charterers shall be entitled, in Charterers' option, to terminate the Charter Party. Termination or failure to terminate shall be without prejudice to any claim for damages Charterers may have against Owners.~~

In the event of this situation becoming un-rectifiable, Charterers to have the option of cancelling the Charter.

## 63) Regulation Changes

~~Notwithstanding any other provisions of this Charter Party, if, during the currency of this charter, any laws and/or regulations are implemented which prohibit or restrict the employment of the vessel in her reasonably intended trade, Charterers, upon written notice to Owners, shall have the option of cancelling this Charter Party. Owners may elect, in writing within 48 hours of Charterers' notice, to make the necessary changes to bring the vessel in full compliance with such laws and/or regulations whereby the vessel can trade fully and freely according to the terms of this Charter Party. Such compliance is to be achieved within 30 days from the date of Charterers' notice of cancellation, failing which Charterers' cancellation of the Charter Party will stand. Any delays due to compliance works shall be off-hire.~~

## 64) Eligibility

It is a condition of this Charter Party that the vessel is in all respects eligible under all applicable laws and regulations for trading to the ports and places specified in Clause 4, and that at all necessary times she shall have on board all certificates (including originals as may be required), records and other documents required for such service. Any delay incurred because of the vessel's failure to comply with the above shall be considered as off-hire.

DYNACOM / KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED - November 25th, 2008
ADDITIONAL CLAUSES

Without limitation to Charterers' remedies under this clause, Owners shall indemnify the Charterers for any losses, penalties, damages and expenses directly/indirectly attributed to vessel's non-compliance with this clause and any delays shall be considered as off hire.

If any element of this clause is breached Charterers shall be entitled, in Charterers' option, to terminate the Charter Party. Termination or failure to terminate shall be without prejudice to any claim for damages Charterers may have against Owners.

In the event of this situation becoming un-rectifiable, Charterers to have the option of cancelling the Charter.

## 65) Oil Pollution Liability Cover

It is a condition of this Charter Party that throughout the duration of this Charter Party the vessel shall be fully entered for standard oil pollution liability cover with a P & I Club belonging to the international group of P & I Clubs.

Upon written request from Charterers, Owners shall promptly furnish evidence of the vessel's entry into a P & I Club and the limits of oil pollution liability cover afforded thereby.

Owners guarantee that they have and will maintain throughout the period of this Charter Party:

a) The Standard Oil Pollution Insurance Covers - currently US$ 1,000,000,000 (one thousand million) - available from their P+I Club; and

b) Any additional Oil Pollution Cover which becomes available via their P+I Club or through Underwriters providing First Class Security.

c) i)  Upon written request from Charterers, Owners to provide written evidence of a) and b) from their P+I Club and/or Underwriters.

ii)  Such documented evidence to be received by Charterers within two one normal working day from the day the fixture was confirmed.

iii)  If such documented evidence has not been received by Charterers before the indicated period, then Charterers shall have the option to either cancel the Charter Party or extend the period by a further working day, and so on at Charterers' option.

## 66) Insurance

A) Overage

Any additional insurance on vessel and/or cargo required because of the age of the vessel shall be for Owners' account.

Vessels aged over 20 years of age must satisfy either of the following two criteria:

i)  The vessel must form part of a fleet which has been managed for a period of not less than three years by the same management and with a minimum number of five vessels under management at anyone time, or

ii)  The vessel must form part of a fleet which has been owned for a period of not

13

DYNACOM/ KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED — November 25th, 2008
ADDITIONAL CLAUSES

less than three years by the same registered owner, with a minimum of three
vessels under ownership at anyone time.

## D). Hull and Machinery

Charterer is under no circumstances whatsoever to be liable for any loss, damage or
expense which is, or could be, covered by standard insurance available commercially.

Charterers shall have the right to be coinsured with Owners under Owners' hull and
machinery insurance in respect of the vessel. Any extra premium due to such co-
insurance is to be for Charterers' account.

## 67) Blocking and Trapping

Expenses for blocking and trapping insurance always to rest with Owners.
The vessel shall be considered off-hire whilst blocked or trapped.

## 68) Bunkers

On delivery under this Charter Party the vessel shall have on board a minimum of
about 500MT of fuel oil and 50 MT of marine gasoil diesel oil, or ten (10) days
reserve of each grade, whichever is the greater.

The Charterers shall supply bunkers of a quality suitable for burning in the vessel's
main engine, auxiliary engines and boilers with a maximum viscosity of 380 CST
[grade to be advised] and which conforms to the specifications of RMG-35 as per
ISO 8217/1996 [grade to be advised] and to supply marine gasoil diesel oil of DMA
as per ISO 8217/1996 [grade to be advised].

If Owners require the vessel to be supplied with more expensive bunkers they shall be
liable for the extra cost thereof, except if required by regulations.

Owners are solely responsible for checking the quality and quantity of the bunkers
supplied and Charterers' responsibility is limited to an obligation of due diligence to
order the correct grade and quantity. Any discrepancy in the quantity of bunkers
supplied and received, where the received quantity is less than the supplied quantity,
is to be protested by master immediately upon receipt of bunkers. Owners are
responsible for any discrepancy that is not immediately protested as above, or is only
subsequently identified, and the value of the shortfall in bunkers received can at
Charterers' option be deducted from hire. Charterers shall have the right to ullage,
inspect and sample vessel's bunker tanks as well as inspect vessel's void spaces and
other tanks whatsoever.

For purposes of bunker reconciliation on delivery and redelivery under the Charter
Party, the prices paid at the vessel's last port of bunkering prior to delivery and
redelivery, as the case may be, will be the relevant ones.

## BUNKER FUEL SULPHUR CONTENT CLAUSE (BIMCO)

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall
supply fuels of such specifications and grades to permit the Vessel, at all times, to comply
with the maximum sulphur content requirements of any emission control zone when the
Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker

DYNACOM/ KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED -- November 25th, 2008
ADDITIONAL CLAUSES

surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and (ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

## 69) Performance

If any continuous off-hire exceeds 5 ~~10~~ 20 days or if any period, during which the vessel is hindered and/or prevented from free trade within this Charter Party due to Owners or vessels fault, accumulated exceeds ~~15~~ ~~30~~ 45 days, Charterers shall have the option to cancel the Charter Party without being able to make any further claims.

~~Such cancellation shall be without prejudice to any claims Charterers may have against the Owners, and the Charterers shall have the option to terminate the Charter Party forthwith.~~

## 70) On and Off-hire Survey

~~Unless otherwise agreed, on and off-hire survey shall be carried out by one surveyor who is acceptable to both parties; the cost and time being equally shared.~~

Charterers to have the right to send one surveyor for on and off hire survey at their time, risk and expense.

## 71) Ship Agents

Charterers to appoint vessel's ship agents at every port of call.

Charterers are responsible for paying all port charges relating directly to the loading, discharging and bunkering operations of the vessel. All other costs in relation to, amongst others, vessel's husbandry costs, including but not limited to stores, provisions, crew changes, cash to Master, medical expenses, spare parts, lubricating oil etc., are for Owners' account and are to be settled by them directly with ship agents.

Any time during which the vessel is detained, or delayed, as a result of failure by

15

**DYNACOM/ KINGFISH SERVICES LIMITED**
TIME CHARTER PARTY DATED – November 26th, 2008
ADDITIONAL CLAUSES

Owners to place ship agents in necessary funds, is considered as off-hire.

Owners to have the right to appoint their protecting agents for owners' matters at their expense.

## 72) Charterers' use of the vessel during off-hire

In the event that the vessel is off-hire for any reason, Charterers shall nevertheless be allowed to perform operations, such as but not limited to tank cleaning and bunkering, provided that these operations do not interfere with Owners' efforts to resume position where vessel is back on hire.

## 73) Equipment

At all times during this Charter Party the Owners will maintain vessel's condition to a good standard always satisfactory to Charterers, including but not limited to:

### A) Tank Coatings

Owners warrant to deliver the vessel with the cargo tank coatings in good condition and to maintain them in good condition throughout the duration of this Charter Party.

### B) Crude Oil Washing System

Owners warrant that the vessel is equipped with a fully functional and efficient crude oil washing system throughout the duration of this Charter Party. Owners further warrant that the Master, Officers and Crew are experienced in the operation of such system.

### C) Cleaning Equipment

Owners warrant that the vessel shall have on board throughout the duration of this Charter Party a full compliment of cleaning equipment in good working order.

### D) Inert Gas System

Owners warrant that the vessel is equipped with a fully functional and efficient inert gas system, which is in use on the date hereof and shall so remain during the period of this Charter Party and that the officers and crew are properly qualified by way of certification for, and experienced in, the operation of such system. Any time lost owing to deficient or improper operation of the inert gas system shall be considered as off-hire.

The vessel's inert gas system shall fully comply with all applicable regulations, including but not limited to, regulation 62, chapter 11-2 of the SOLAS Convention 1974 as modified by its protocol of 1978 and Owners undertake that such system shall be operated by the officers and crew in accordance with the operational procedures set out in the latest IMO publication regarding the operation of inert gas systems.

If Charterers so require, Owners shall arrange for the vessel's tanks to be de-inerted to facilitate inspection, gauging and sampling. Any time taken in de-inerting, inspecting, gauging, sampling, and re-inerting thereafter shall count as on-hire.

16

DYNACOM/ KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED – November 25th, 2008
ADDITIONAL CLAUSES

E) Cast Iron

Owners warrant that all riser valves and fittings, outboard of the last fixed rigid support to the ship's deck that are used in the transfer of cargo or ballast, will be made of steel or nodular iron and that only steel reducer or spacer will be used between the ship's valve and the loading arm. The fixed rigid support must be designed to prevent both lateral and vertical movement of the transfer manifold.

F) Mooring Equipment

Owners warrant that, throughout the duration of this Charter Party, the vessel shall have on board sufficient ropes and wires ~~for mooring at all ports and terminals within the trading limits under this Charter Party~~ in accordance with the description of the vessel's mooring systems in VPQ/Q88 provided to Charterers.

G) Reducers

Owners warrant that, throughout the duration of this Charter Party, the vessel shall have on board a complete set of reducers that are at Charterers' disposal.

## 74) Crew

A) Crew Operational Knowledge and English Speaking Clause

Owners guarantee that there will be on board, at all time, sufficient personnel with a good working knowledge of the English language, both written and spoken.

B) Vaccination

Owners to arrange at their expense that the Master, Officer and Crew of the vessel, are to hold valid vaccination certificates against yellow fever, cholera, typhoid, tetanus and smallpox upon delivery of the vessel and throughout the time charter period. Any other vaccination requirement which may come up from time to time throughout the world and are relevant to the vessel's trading, shall be carried out at Owners' expense.

## 75) Loading Rate

Owners warrant that the vessel shall load at a minimum rate of  1500 cbm/hr [Owners to advise] cbm/hr, through 1 manifold connection, provided shore facilities permit. Above stated loading rate is given by Owners to the best of Owners' knowledge. In view of the vessel being  the first delivery of this type, Owners and Charterers  herewith  agree  that  Charterers  shall  refrain  from  claiming underperformance during the first 3 months from the date of delivery.  Revised minimum loading figures shall be adopted by parties and inserted in the time charter party latest within the first 3 months from delivery.

## 76) Pumping Capacity

Owners warrant that throughout the charter period, the vessel shall discharge entire cargo within 24 hours, excluding ~~including~~ time for stripping and cow, or maintain an average 100 psi at ship's rail provided shore facilities can permit same and that the vessel is not in any way restricted/interrupted from using all her pumps and lines. Should the vessel fail on any occasion to maintain the warranted rate of discharge throughout as aforesaid, Charterers shall deduct the excess of discharge time, plus

17

DYNACOM / KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED - November 25th, 2008
ADDITIONAL CLAUSES

excess bunkers consumed, from the hire.

Should it become necessary to withdraw the ship from berth because of her failure to maintain the discharge rate, all time and expenses incurred are to be for Owners' account. In such circumstances, all time until re-berthing shall be considered as off hire.

## 77) Heating

Vessel to load cargo up to and including 165 degrees F. Vessel to be able, throughout the time charter period, to maintain the cargo temperature up to a maximum of 135 degrees F and if loaded below, vessel shall be able to heat cargo up to a maximum of 135 degrees F if so require provided time permits.

## 78) De-ballasting

Owners warrant that the vessel shall be able to simultaneously discharge ballast or slops and load cargo always with two-valve segregation while maintaining minimum thirty percent (30%) deadweight. Any delay due to non-compliance with this clause to be for Owners' account and shall be considered as off hire.

## 79) Cargo Retention

In the event that any cargo remains on board upon completion of discharge, Charterers shall have the right to claim from Owners (but in exceptional circumstances, Owners are to permit Charterers suitable consideration to simply deduct) deduct from hire an amount equal to the FOB load port value of such cargo plus hire and bunkers, with respect thereto, provided that the volume of cargo remaining onboard is liquid - as determined by two independent surveyors, one appointed and paid by the charterers and one appointed and paid by owners, whose findings shall be final and binding, appointed by Charterers and acceptable to both Owners and Charterers - and pumpable by the vessel's pumps, or would have been liquid and pumpable but for the fault or negligence of Owners, the Master, the vessel or her Crew (including but not limited to incorrect trim and heating procedure).

Any action or lack of action in accordance with this provision, shall be without prejudice to any other rights or obligations of the parties. For the purposes of this clause, any accredited surveyor shall be considered acceptable to both Owners and Charterers.

## 80) Ship to Ship Transfer

Charterers have the option to load and/or discharge and/or lighten the vessel via ship to ship transfer. Maximum two ship to ship transfer per month. All operations to be performed in accordance with the recommendations set out in the latest edition of OCIMF's 'Ship to Ship Transfer Guide (Petroleum)', always at a safe location as designated by the port authorities within trade limits of this charter party, provided weather permitting, during daylight hours only, under the supervision of qualified/experienced mooring Master, at a location considered safe and acceptable to Owners/Master and always in Master's discretion with regards to safety. If the Master feels that the safety of his vessel is threatened has the right to order the lightering vessel away. and Owners undertake that the vessel and her crew will comply with such recommendations.

18

If Charterers should request permission for additional lighterage or ship-to-ship transfer operations each month, such permission to always be at the discretion of Owners, with such permission not to be unreasonably withheld. It is mutually understood that the vessel should never be used as a dedicated lighterage vessel.

## 81) Tank Preparation / Cleaning

On delivery the vessel to be clean to carry all cargoes, within the terms of this Charter Party, in all tanks including slop tanks.

Vessel's crew shall prepare and clean tanks, lines and pumps in accordance with Owners'/vessel's normal cleaning practices (that are not to be excessive given standard industry practices for cleaning and, where relevant, tank coating manufacturer's recommended procedures) for the intended cargo and to Charterers' Inspector's satisfaction.

## 82) Watchmen

Any watchmen specifically required by Owners during the term of this charter shall be for Owners' account. It is understood and agreed that where use of watchmen is required by port regulations, same shall be for Charterers' account.

## 83) Operational Compliance

Owners shall be responsible for any consequences or additional expenses arising as a result of non-compliance with the following and any delays as result of non-compliance shall be considered as off hire:

### A) Noon Position / ETAs

The Master shall telex his noon position, plus average speed, distance steamed, weather conditions and bunker ROB, every day during this charter. Furthermore the Master to keep Charterers fully advised of vessel's ETA at all times and any change in ETA of more than 6 hours immediately be notified to Charterers.

### B) Re-measurement

Charterers have the option to re-measure the vessel up or down as the case may be for the purpose of satisfying certain port/terminal regulations. All cost and time to be for Charterers' account including cost and time for re-measuring to original deadweight. Vessel to be redelivered with original deadweight.

### C) Blending

Commingle / Re-Circulation / Cargo Additives – Clause

Owners agree, if so requested, to instruct the Master to commingle / re-circulate the cargo/cargoes loaded on board / add cargo additives (such as pour point depressant, anti static additives, metal deactivators, H2S scavengers, de-emulsifiers) or transfer cargo between tanks (in order to obtain homogenous blend), always in strict compliance with safety/stability rules and subject to the technical/coating characteristics, limitations and capabilities of the vessel.

19

**DYNACOM/KINGFISH SERVICES LIMITED**
**TIME CHARTER PARTY DATED · November 25th, 2008**
**ADDITIONAL CLAUSES**

If commingling / re-circulation / cargo additives in cargo/cargoes loaded on board is effected pursuant to Charterers request, Owners not to be held responsible for the result and Charterers to keep Owners harmless and fully indemnified against all claims for contamination or quality deterioration or any other off-spec whatsoever resulted thereof.

In any event Charterers before any commingling / re-circulation / adding cargo additives is performed must provide Owners with an LOI for any of above operation(s) in Owners wording.

LOI always be signed by an authorized officer of Charterers. Owners/Master can only be indemnified if they follow Charterer's instructions.

### D) Hoses

If required by Charterers, the vessel's crew are to connect/disconnect hoses (including flexible hoses), without charge to Charterers for any time or overtime involved.

### E) Sweeping / Squeegeeing

If required the vessel's crew is to perform sweeping or squeegeeing of ship's tanks without charge to Charterers for any time or overtime involved, at charge to Charterers.

### F) Sampling

If required by Charterer's Inspector or Surveyor, vessel will open tank ullage ports in order to allow for cargo samples to be drawn. If any depressurizing and reinserting required same shall always be at Charterers' time and expense.

### G) Clean Ballast

Throughout the duration of this Charter Party, the vessel is always to arrive at all load port(s) with clean ballast only.

### H) Slow Steaming

Charterers have the right to order the vessel to proceed at slow speed at any time. For the purposes of vessel's performance Owners warrant that the vessel has the following speed/consumption relationship at slower speeds:

    i) ........[Owners to state].

    ii) ........[Owners to state].

    iii) ........[Owners to state].

### I) Voyage Orders

Owners undertake that, unless Charterers require otherwise, the Master will follow voyage orders issued by Charterers.

28

**DYNACOM/ KINGFISH SERVICES LIMITED**
TIME CHARTER PARTY DATED – November 25th, 2008
ADDITIONAL CLAUSES

If a conflict arises between terminal order and Charterers' voyage instructions, Master is to stop cargo operations and to contact Charterers at once. Terminal orders shall never supersede Charterers' voyage instructions and any conflict shall be resolved prior to resumption of cargo operations. The vessel is not to resume cargo operations until Charterers have directed the vessel to do so.

Notwithstanding anything else to the contrary in this Charter Party and notwithstanding what loading and/or discharging port(s)/place(s)/range(s) may have been nominated and Bill(s) of Lading issued, Charterers shall have the right to change its nomination and/or vary the rotation of the loading and/or discharging port(s)/place(s)/range(s). Charterers' option to change a nominated port/place/range and/or vary the rotation, as aforesaid, shall remain valid at all times irrespective of whether cargo handling operations have commenced, or not. Charterers shall have the right to make as many changes as it deems necessary, and against relevant LOI if requested.

## 84) Representative On Board

It is understood that the Owners/Master/Officers and Crew will give to the Charterers' representative on board in port/at sea maximum assistance provided he does not interfere with the operation of the vessel and act as an observer only.

Charterers may at their option place a cargo transfer inspection representative on board to observe load/discharge of cargo during the period the vessel is in port. Charterers' representative may render advice to the Master relative to avoidance of any type of pollution but he will not however, under any circumstances, order or direct the taking of any particular action by vessel or crew or interfere in any way with Master's exercise of his authority.

Any representative and/or supercargo of Charterers may accompany vessel and is to be accommodated in the best available accommodation and is to be permitted to dine at the captain's table.

## 85) In Transit Loss

Owners to be responsible for any cargo in-transit loss exceeding 0.5%. 0.3%, as determined by surveyor's figures. In-transit loss is defined as the difference between vessel's net standard total calculated volume after loading at the load port and before unloading at the discharge port, based on ships figures. Calculation to be based at 60 Deg. F. Such losses to be claimed from the Owners (but in exceptional circumstances, Owners are to permit Charterers suitable consideration to simply deduct) deducted from hire at an amount equal to the FOB load port value of such cargo, plus hire and bunkers with respect thereto.

## 86) Lightering

It is understood that lighterage/top-off operations conducted in the usual lighterage areas, conducted in the customary manner and to the satisfaction of the Master, are allowed at Charterers' expense.

## 87) Smuggling

Smuggling is forbidden and if Master, Officer(s), Crew or Owners' servants are found

21

**DYNACOM/ KINGFISH SERVICES LIMITED**
**TIME CHARTER PARTY DATED – November 25th, 2008**
**ADDITIONAL CLAUSES**

to be smuggling, Charterers shall have the right to cancel the Charter Party. Any expenses and/or fines incurred will be for Owners' account and any delays incurred will be considered as off hire.

## 88) Notice of Readiness

At every load port and discharge port, throughout the duration of this time charter, the vessel shall tender her NOR immediately on arrival in the customary way. Until such time as the vessel is all fast at the berth/jetty, the Master shall re-tender vessel's NOR, daily, at 09:00 hours local time, to all parties as instructed in the Charterer's load/discharge orders.

The text of subsequent daily NOR, as above, to be:

*"Without prejudice to original NOR tendered at .... Hrs on.....20........ [to be completed as appropriate], on vessel's arrival, please be advised that my vessel is/remains ready in all respects to commence loading/discharging (delete as appropriate) of the cargo of .............. [complete as appropriate]".*

## 89) Pumping Logs

At each port of discharge, the vessel is to maintain a proper and accurate discharge pumping record. This log must be countersigned by Master, Discharge Port Inspector and representative of the receiving terminal when signatures obtainable. On completion of discharge, this record is to be promptly sent faxed to Charterers. Should receivers/terminal representatives signatures not be possible to obtain, Master to issue relevant letter of protest via agents.

## 90) Communication Devices

Owners guarantee that the vessel is equipped with technical and human means capable to send and receive via satellite or radio, all messages necessary to the commercial operation. Vessel is fitted with Inmarsat C, telex, phone, facsimile and e-mail.

It is agreed that Charterers may, at any time, from the time of fixing until discharge of the final cargo carried under this Charter Party employ an Inmarsat C tracking system on the vessel. Such tracking systems work on data provided automatically from the vessels onboard Inmarsat C system. Any costs relating to this tracking system will be for Charterers' account.

## 91) Libyan Certificate

If required for calls to Libya, Owners shall arrange for vessel's certificates to be translated into Arabic language for their risk and time and at their expense.

Owners to ensure that vessel always has duly signed Libyan Discharge Certificate from last call to Libya onboard.

## 92) Tracking Clause

It is agreed that the Charterer may from the time of fixing until completion of the charter period employ an Inmarsat C tracking system on the vessel operated by Purple Finder.

22

DYNACOM/ KINGFISH SERVICES LIMITED
TIME CHARTER PARTY DATED - November 25th, 2008
ADDITIONAL CLAUSES

All registration and direct communication costs relating to this tracking system will be for the Charterer's account. The Charterer will advise the Owner when the system is operative and confirm termination on completion of this charter.

The Owner is required to supply the following information to the Charterer to enable installation

| | |
|---|---|
| VESSEL'S NAME | |
| INMARSAT NUMBER 9 DIGITS (1ST IS 4) | |
| MAKE AND MODEL OF TERMINAL | |
| MODEL NUMBER | |
| TERMINAL S/W VERSION | |
| SERIAL NUMBER | |

# Owners Additional Clauses to Shelltime 4

## Cancellation Clause

Notwithstanding any other clause in this charter party, if the vessel is unable to meet the agreed laycan, Owners to advise Charterers of her ETA or estimated time of readiness and Charterers have the option to cancel the charter party without further recourse, penalty or claim by either party, providing same advised within 2 working days of Owners notice, failing which, charter party to remain in full force and effect with new laycan being 48 hours after ETA.

------ E N D ------

23

New Times Shipbuilding Co. ltd/Product Tanker

| | | | |
|---|---|---|---|
| NAME | : | IGS | : YES |
| CALL SIGN | : | COW | : YES |
| EX NAME | : N/A | SBT | : YES |
| DWT | : 73000 MT | CBT | : NO |
| DRAFT | : 14.50 M | CLASS | : ABS |
| FLAG | : LIBERIA | BOW FAIRLEAD | : 2(600X450mm) |
| BUILT | : 2009 | CHAIN STOPPER | : TONGUE TYPE |
| LOA | : 228.60 M | (SWL) | : 2 X 200 TONS |
| BEAM | : 32.26 M | SCNT | : |
| BCM | : 112.40 M | CRANES | : 1 X 15 TONS |
| | | PUMPS... | : 3 X 2300 CBM/HR. |
| CUB.CAP AT 98% | | | |
| INCL. SLOPS | : 85850 CBM | | |
| GRT | : 42010 T | | |
| NRT | : 22454 T | | |
| COILED | : YES | | |
| COATED | : Whole Tank Pure Epoxy | | |

VESSEL'S APPROXIMATE CONSUMPTIONS AS FOLLOWS: (all consumptions basis pdpr unless otherwise stated)

| | |
|---|---|
| steaming laden on abt 14/15 kts | : 37/42 mts + 5 mts for DG FO 380 cst |
| steaming ballast on abt 14/15/16 kts | : 35/37/39 + 5 mts for DG FO 380 cst |
| full discharge+ inert gas+COW+BALL | : 68 mts FO 380 cst (per operation) |
| discharge+ballast+IGS | : 63  mts FO 380 cst (per operation) |
| for full load+deballasting | : 18 mts FO 380 cst (per operation) |
| loading | :  8  mts FO 380 cst (per operation) |
| heating Maintain 135 F | : 20 mts per day |
| to raise temp | : 26 mts per day |
| At anchor – idle | : 6 mts FO 380 cst per day + 3 mts MDO per day |
| Add. Tank cleaning | : 3 mts FO 380 cst per hr |
| Add. For inerting/de-inerting | : 1.50 mts FO 380 cst per hr |

ABOVE CONSUMPTIONS EXCLUDE MANOUVERING WITHIN HARBOURS, INLAND WATERWAYS, CANALS ETC., AND ARE BASIS GOOD WEATHER, CALM SEAS WITH NO ADVERSE CURRENT AND WIND FORCE NOT EXCEEDING BEAUFORT 4.

```
--------------------
```
From: Mark Siemeck
To: Rexer, Rob
Cc: Frank Mertens
Subject: Constantinos and Maistros

Rob

Sorry to miss your call last night but had been expecting your call at 18.30.

We regret to advise Dynacom that we, Kingfish, as charterers are not in a position to sustain these charters and we are left with no alternative but to redeliver the vessels early.  The Constantinos is redelivered as of now and the Maistros will redeliver in China on completion of discharge between the 11th and 12th of August in China.

Please note the Maistros hire is paid until the 2nd of August and that she will redeliver with approximately 500mt of bunkers on board which exceed hire for the last period.  The Constantinos redeliuvered with 612 mt of hsfo and 275 of lsfo.

As we have explained to owners on several events we are a company of limited resources and we cannot sustain these charters.  We had hoped that the South American business we proposed was of adequate compensation but unfortunately owners are not prepared to consider that.

We very much regret this course of action but the company cannot keep trading in these circumstances and we are looking at winding up procedures now.

Regards
```
--------------------
```

Ex. C

# GALA INVESTMENTS INC.
## MONROVIA – LIBERIA

MESSRS: KINGFISH SERVICES LIMITED

DATE: 11ᵗʰ August 2009

IN ACCOUNT WITH: M/T MAISTROS / TCP 25.11.08

**MAISTROS/KINGFISH/CP 25.11.08**
Vsl delivered on 28.5.09/1130 GMT

Period from 28.5.09/1130 GMT UP TO ESTIMATED COMPLETION OF DISCHARGE AT HUIZHOU 12.8.09/1000 GMT

| | | |
|---|---|---|
| Hire 75.9375 dys X $ 26,0000 | | USD 1,974,375.00 |

**B.O.D**

| | | | |
|---|---|---|---|
| FO 46.671MT X $ 494.12 | USD 23,555.19 | | |
| FO 599.629 MTX$ 384 | USD 230,257.54 | | |
| DO 61.817 MT X $772 | USD 47,722.72 | | |
| DO 39.173 MR X $ 558 | USD 21,858.53 | USD 323,393.98 | |

| | | |
|---|---|---|
| Less 1.25 pct Poten+Partners | (USD | 24,679.69) |

**CHARTS REMITTANCES**

| | |
|---|---|
| $ 687,801.81 – 9.6.09 | |
| $ 323,360.98 – 9.6.09 | |
| $ 533,250.00 – 9.7.09 | (USD 1,544,412.79) |
| Balance due to owns up to estimated completion of discharge Houizhou | USD 728,676.50 |

(ERRORS / OMISSIONS EXCEPTED)

PAYABLE TO:
THE ROYAL BANK OF SCOTLAND PLC
45 AKTI MIAOULI STREET
185 10 PIRAEUS –GREECE
SWIFT: RBOSGRAA
IN FAVOUR OF: GALA INVESTMENTS INC
ACC NO.212058 –100
IBAN NO.GR46 0640 0010 0055 5521 2058 100
REF: M/T MAISTROS – TCP 25.11.08
U.S.CORRESPONDING BANK
JP MORGAN CHASE BANK NEW YORK
1,CHASE MANHATTAN PLAZA
NEW YORK, N.Y 10081 USA
SWIFT: CHASUS33XXX, ACC: 544721631